**UNITED STATES of America,**
**Libelant,**

v.

**ONE 1957 CHEVROLET 2-DOOR SE-**
**DAN SERIAL NO. VC-57F195407,**
**Respondent.**

**Civ. A. 33991.**

United States District Court
N. D. Ohio, E. D.
Dec. 18, 1957.

**213**

Sumner Canary, Cleveland, Ohio, U. S. Dist. Atty., for libellant.

Philip Kasdan, Cleveland, Ohio, for respondent.

CONNELL, District Judge.

This matter came on to be heard on November 4, 1957 on the libel petition of plaintiff and Answer and Cross-Petition of the Paramount Finance Company.

This Finance Company held a mortgage on a new Chevrolet Sedan which was seized by government investigators on the premises of one Lloyd Misher Park, in whose case for the violation of the laws of the United States the said Park had pleaded guilty for the illegal possession of a large still and mash and spirits, without the required bond and registration, said matter having been previously before this court, and said Park, after our consideration of a voluminous probation report in which all of his activities had been well detailed, had been thereupon sentenced to 4 consecutive terms of 2 years each for a total of 8 years. His equipment and operation was said to have been the largest seized in Northern Ohio in some decades.

There can be no question of Park's guilt and sentence and facts surrounding his apprehension, all of which were known to the court before the filing of the within libel.

In this libel action, government investigators testified to Park's unusual cleverness: to their having followed him and lost the chase on numerous occasions: to his daring, such as was illustrated on one occasion when in pursuit, he entered a one-way street going in the wrong direction (which investigators would not do) and then made a U-turn and escaped while our investigator went around the block to catch him. He deceived government agents with success for many months, before his apprehension, in a remote section of Ashtabula County many miles away in which this car was found near the house in which he had built a large still.

Another of Park's clever deceits was to operate 3 or 4 different cars on the same day. Unquestionably he was a most "artful Dodger". He did aggravate our Agents. And we believe he was adequately punished therefor.

And he also deceived the finance company here involved in an equally clever way. Its manager was a young man, probably 25 to 27 years of age, operating a very small office in an eastern section of the city, who was called by a sales agency man whom he knew, and who was working out what sounded like a good financial deal on a new car, for the prospective purchaser, Park. The manager handled the matter in the usual routine fashion in which he handled all such matters.

He got his information together in a certain form on a certain form. And he made the routine phone calls he made in all such cases.

The clever way in which Park deceived him was as follows: Park had claimed to be employed in a certain tavern, giving its phone number, and the finance man called the number and when "Park" answered the phone, the truth of his employment was thus assured.

The evidence before this court disclosed that Park did not work in the tavern but was an unwanted hanger-on in the place. It contained no phone except a pay station which was the phone number on Park's application and the reason Park answered the phone was because he beat all others to the booth. So his cleverness at fooling the investigators equalled his cleverness at fooling this finance company.

The finance manager made a call to the Cleveland Retail Merchant's Association which reported in some detail that Park's credit record was very good. This is an Association which is rather universally employed in Cleveland by department stores, banks, insurance companies, and finance companies for such purposes as was here involved. This Association would have been able to furnish a criminal history on Park, if he had one, but he had never before been arrested or convicted of any offense of any kind.

At no time did the manager have any reason whatsoever to suspect that this transaction was any different from any other. At no time did he have the slightest reason to suspect that there was anything wrong with Park. He handled the deal as he handled all others. In fact, he handled it in the manner rather universally employed in our metropolitan city. He relied entirely upon the credit bureau on which Cleveland business people universally rely. There was nothing anywhere in the transaction to arouse any doubt or suspicion. But the government here contends that is not sufficient: that it was nevertheless the duty of the finance company to make contact with the proper governmental departments to get their assurance this prospective purchaser did not have a bad reputation: that for failure so to do the company must lose its property.

We are here concerned therefore with Section 3617. And it may be that a very few finance companies who know of this law through the previous seizure of property seek to comply with it in every instance, but to the personal knowledge of this court, the only ones who do so are those whose mortgaged cars have been previously seized, who learn of this section by experience and who thereafter protect themselves by making one of the three statutory inquiries which constitute defense.

At first blush, the need for making such inquiry in each and every case of transfer, under Section 3617, does appear reasonable, until one considers what would actually happen if every prospective transfer of a new or used car in a community like Cleveland, involved an investigation of the "reputation" of the prospective purchaser at one of the three points at which such reputation information is to be theoretically furnished; namely, at the office of the chief of police, or sheriff, or governmental agency.

Our Sheriff and his headquarters, with his limited manpower, would have no time or opportunity to gather or disseminate such reputation information. Our Chief of Police and his rather inadequate force are too busy on the last hours' robberies, thefts and homicides to do the same. They have too many instant crimes to trace to make records of the reputations of the bootleggers, but if one really sought to ascertain it, to this court's personal knowledge, such one would walk a long way within the building to learn.

In this instance the top government man involved did know the answer, but what a task our young manager in the East End would have had to find him to get his answer since the agent said he couldn't give it to an unknown voice on the phone, nor could he talk as he said except to persons to whom he could entrust the information.

This court was a judge of our Cuyahoga County Common Pleas Court for 13 years. Our court clerk there had the responsibility for record keeping in all these transfers of cars. It was and is common knowledge that over 160,000 cars a year are transferred in Cuyahoga County alone.

This is well over 600 cars per working day. It takes a large office force to accept and record their prepared papers. And Cuyahoga is but one county in this District. Other large cities like Akron and Youngstown have comparable situations. Twenty other counties are involved. And there are countless such credit investigations where sales are not made.

If our good agent in this instance, who would give the information to a friend whose voice he recognized on the phone and who might be willing to talk of a bootlegger's reputation to someone he could trust—if he was inquired of by even 10% of these 600 sales per day, he could hardly have time to do his work. Even 1% of them would be an annoyance.

And if this young man from this very small office in the East End could take the time and have success to find him, who knows to what extent just on his first appearance he might have been entrusted with the information?

And surely the rest of this District on a population and business basis would multiply these figures by two.

So while Section 3617 was sacred as any other law in the books—if it was known and complied with to the degree in which the government here insists, it would become a practical and physical impossibility in any large metropolitan area to make it work, unless we are merely to automatically confiscate property as a punishment against those property owners who have the misfortune of selling to the wrong people, because it is physically impossible for them to learn who are the right people, unless they go through a legal procedure known only to its earlier victims.

The government's contention herein is that the finance company should lose its property because it failed to make an inquiry of any one of the three branches of government mentioned. The finance company's inquiry here in truth and in fact was limited to its inquiry of the credit agency which in Cleveland is utilized universally by all businesses concerned in such inquiries as to credit and past criminal history of applicants. The government says that to have limited its inquiries to the Credit Agency alone is not sufficient. We believe the government is much in error in its contention.

Our own Judge Martin in 13 F.Supp. 104, back in 1935, in the case of United States v. One 1935 Ford Standard Coach Automobile, had the same question. Judge Martin (page 106) appreciates the growing volume of the business of financing the purchase of cars, and he states (page 107) that to require that every prospective purchaser be checked out with law enforcement officials would constitute an "insult." He states that reasonable suspicion or sensible inquiry requires what the government here asks but that if such reasonable inquiry as an ordinarily prudent person makes elicits no suspicion, *then inquiry at law enforcing departments is not required.*

Judge Martin states that any such rigid contention as is requested herein would be *violative* of those of our *Constitutional Rights* which secured citizens against unreasonable seizure of property.

If the government's contention here be true then no business people could dare to sell any cars to anybody. Nor could such inquiry be made in every case. Nor could government agents lose the time required to answer such inquiries in every case and still have time to do their work.

The government in brief cites Judge Allen's decision in Universal Credit Company v. United States, 6 Cir., 91 F.2d 388 as authority for its contention. Such case contains the quotation which is cited. But the tenor of the decision is against the government's claim for it.

It decides that rigid investigation is not required unless suspicion is aroused.

There was never claim in the within case that anything happened in the history of the matter which should have aroused suspicion on the part of the Finance Company herein. All evidence is to the contrary.

Judge Allen's opinion cites 2 conditions requiring investigation, neither of which was present here, to wit: The arousing of suspicion by reason of facts brought to the attention of the finance company; and secondly, the possession of a criminal record for violating the liquor laws. Park had never previously been arrested for anything. And no facts were here present arousing any suspicion. So this decision does not support the government's view.

Judge Kloeb, in United States v. Oldsmobile Sedan, D.C.1938, 24 F.Supp. 974, reiterated the 3 requirements on a claimant for return of his property, but refused same because that owner had been placed on its guard with reference to a previous criminal record of mortgagor for violation of liquor laws.

We have no comparable situation here. Three government agents testified herein as to their various reasons for suspecting that this mortgagor was in the bootleg business; one was stationed in Youngstown and made the ultimate arrest of Park; one ran the Cleveland office and he knew of Park from the third, who pursued Park often and unsuccessfully. Each said Park had the "reputation" of being a bootlegger. Under the decision of Judge Learned Hand in United States v. C. I. T. Corporation, 2 Cir., 93 F.2d 469, 470, in a situation quite similar to this, it was held that one's being investigated for a year did not give a buyer a "reputation" as a bootlegger. And Judge Hand held reputation to consist of a little more than the suspicions, however justified, of as small a number as our three.

The first two requisites were present in that case as in this. But with reference to the vital third, Judge Hand decided as follows:

"The third condition is itself subject to a condition, for the duty of inquiry is not imposed upon the seller unless the buyer has in fact 'a record or reputation' as a violator of the liquor laws. We do not decide whether the claimant has the burden of disproving this condition, for the libellant concedes that it has not; that has, indeed, been twice held in district courts. United States v. One 1936 Model LaFayette Coupé Automobile, 14 F.Supp. 1003, 1005; United States v. One 1935 Chevrolet Coupé, 13 F.Supp. 986. So much granted, the case falls, for the libellant made no effort to show that either Goldberg or Margolis had in fact any 'record' or 'reputation' as a violator of the liquor laws. *The notion seems to be that because the officials had been investigating Goldberg for a year, that gave him the reputation as a violator of the liquor laws. That is an error. The statute is drawn so as to impose upon the seller the duty of inquiry only where there exists something which is likely to reach his ears, a public record or a general reputation.* No doubt he always takes the chance in any sale that there may be one or both of these; but his duty does not arise if there is not. Even then he will escape if the officials do not confirm it upon inquiry. Here there was no record; the libelant does not allege that the pending investigation was such. Nor was there any reputation. Some of the officials—how many we do not know—had for long suspected Goldberg of breaking the liquor law, but that did not give him the reputation of doing so. Such inquiries are kept secret lest they come to the knowledge of the suspect and he become wary. The statute means not that, but reputation in the usual sense, a prevalent or common belief, a general name, the opinion of a number of persons, a more or less extended and public attribution of the crime, *likely to be spread about*

so as to reach the seller. The knowledge of those charged with the duty of prosecuting Goldberg was not likely to do so.

"The libellant answers that even so, remission lay in the court's discretion under section 40a(a) and that the discretion exercised in the case at bar was final. United States v. One 1935 Dodge Rack-Body Truck, [2 Cir.], 88 F.2d 613, 615. But though the power be discretionary, the discretion must be governed by the evidence; it may not be baseless. In the case at bar there were no suspicious circumstances to lead the claimant to refuse to accept the contract; *we are not to say that no car can ever be sold without inquiry at the local 'Alcohol Tax Unit.'* Decree reversed, forfeiture remitted." (Emphasis ours.)

From which we conclude that while three government witnesses testified to "bad reputation" of Park, their basis for it amongst themselves was in a legal sense their mutual suspicion which they communicated to each other based only on their investigation which was not successful at the time of transfer of the car. The last phrase of the last sentence in Judge Hand's opinion is quite significant, for the government's claim here is that no car can ever safely be sold without inquiry at the Tax Unit; its claim is that an inquiry as to credit alone is not enough; Judge Hand says "we are not to say that no car can ever be sold without inquiry at the 'Alcohol Tax Unit,' ". But the contrary is the government's claim here.

We find that there was here no reason for the Finance Company to suspect that there was anything wrong or suspicious about the buyer or the transaction: and that this transaction was no different than any other; that its conduct here meets the test in all reported cases. Our Supreme Court points out, as appears in Manufacturer's Acceptance Corp. v. United States, 6 Cir., 193 F.2d 622, at page 624 that forfeitures are not favored and should be enforced only when within both the letter and spirit of the law; that the statute is remedial with the purpose to afford relief where the claim is reasonable and just, and that it should be liberally construed to carry out that result.

We feel that the Finance Company's claim here is reasonable and just and we find for this defendant.